## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 11-00271-WS |
| | * | |
| MICHAEL WAYNE HEARIN | * | |

### PLEA AGREEMENT

The abovecaptioned defendant, represented by his counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1. The defendant understands his rights as follows:

   a.    To be represented by an attorney;

   b.    To plead not guilty;

   c.    To have a trial by an impartial jury;

   d.    To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and

   e.    To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2. The defendant waives rights b through e, listed above, and pleads guilty to Count 1 of the Indictment, charging a violation of Title 21, United States Code, Section 846, conspiracy to manufacture methamphetamine, a Schedule II controlled substance.

3. The defendant understands that the statements he makes under oath in the plea of

Rev. 07/10

guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.   The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.   The defendant is not under the influence of alcohol, drugs, or narcotics.  He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.   The defendant has had the benefit of legal counsel in negotiating this Plea Agreement.  He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him.  The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offense.

7.   The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt.  The defendant and his counsel have discussed possible defenses to the charge.  The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8.   A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing.  The Factual Resume is incorporated by reference into this Plea Agreement.  The defendant and the United States agree

Rev. 07/10

2

that the Factual Resume is true and correct.  Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

9.     This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement.  There have been no promises from anyone as to the particular sentence that the Court will impose.  The defendant is pleading guilty because he is guilty.

10.    The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter.  This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.    The maximum penalty the Court could impose as to Count 1 of the Indictment is:

a.       10 years to life imprisonment;

b.      A fine not to exceed $16,000,000;

c.      A term of supervised release of 8 years, which would follow any term of imprisonment.  If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.      A mandatory special assessment of $100;

e.    Criminal forfeiture.

## SENTENCING

12.   The Court will impose the sentence in this case.  The United States Sentencing Guidelines are advisory and do not bind the Court.  The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation.  The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines.  The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.   The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.   The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation.  Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15.   Both the defendant and the United States are free to allocute fully at the time of

sentencing.

16.   The defendant agrees to tender $100 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case.  The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## FORFEITURE

17.   The defendant agrees to confess the forfeiture to the United States of all properties which represent proceeds of his criminal activities or which facilitated any aspect of these illegal activities.

## UNITED STATES' OBLIGATIONS

18.   The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss all remaining counts once sentence is imposed.  This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

19.   The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

20.   The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United

States in the exercise of its discretion. If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

a.   The defendant shall fully, completely, and truthfully respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offense(s) with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

b.   The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question him specifically about any such offense. This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.   The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited

to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.      If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher.  The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.      The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense.  This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.      The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.      If the defendant provides full, complete, truthful and substantial

cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable.  The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance.  The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure.  If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant

receive a sentence at the low end of the advisory guideline range.

h.   The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1)   permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)   permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement.  The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during his breached cooperation.  Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

Rev. 07/10

9

i.  Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

j.  The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

21. As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or

sentence (including a sentence imposed on revocation of probation or supervised

release) in any district court or appellate court proceedings.

    a.    **EXCEPTIONS.**  The defendant reserves the right to timely file a direct

        appeal challenging:

        (1)    any sentence imposed in excess of the statutory maximum;

        (2)    any sentence which constitutes an upward departure or variance

               from the advisory guideline range.

        In addition, the defendant further reserves the right to claim ineffective

        assistance of counsel in a direct appeal or a petition filed pursuant to Title

        28, United States Code, Section 2255.

22.    If the United States files a notice of appeal and such appeal is authorized by the

        Solicitor General, the defendant is released from the appellate waiver.

23.    The defendant further reserves the right to timely move the district court for an

        amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive

        amendment to the Sentencing Guidelines which would affect the sentence.

24.    If the defendant receives a sentence within or below the advisory guideline range,

        this plea agreement shall serve as the defendant's express directive to defense

        counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by

        the defendant.

## VIOLATION OF AGREEMENT

25.    The defendant understands that if he breaches any provision of this Plea

        Agreement, the United States will be free from any obligations imposed by this

agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

26.     In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## ENTIRETY OF AGREEMENT

27.     This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: 1/12/10

Gloria A. Bedwell
Assistant United States Attorney

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true

Rev. 07/10

12

and accurate in every respect, and that had the matter proceeded to trial, the United States could

have proved the same beyond a reasonable doubt.

Date: _1 - 19 - 12_                     _Michael Wayne Hearin_

                                    Michael Wayne Hearin
                                      Defendant

       I am the attorney for the defendant.  I have fully explained his rights to him with respect

to the offense(s) charged in the Indictment in this matter.  I have carefully reviewed every part of

this Plea Agreement with him.  To my knowledge, his decision to enter into this agreement is an

informed and voluntary one.  I have carefully reviewed the Factual Resume, incorporated herein,

with the defendant and to my knowledge, his decision to stipulate to the facts is an informed,

intelligent and voluntary one.

Date: _1-19-12_                         _____

                                     Raymond L. Bell, Jr., Esq.
                                     Defense Counsel

Rev. 07/10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA     *
    *
v.     *     **Criminal No. 11-00271-WS**
    *
MICHAEL WAYNE HEARIN     *

## FACTUAL RESUME

The abovecaptioned defendant admits the allegations of Count 1 of the Indictment.

## ELEMENTS OF THE OFFENSE

The defendant understands that in order to prove a violation of Title 21, United States Code, Section 846, conspiracy to manufacture methamphetamine, as charged in Count 1 of the Indictment, the United States must prove:

first, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the manufacture of methamphetamine; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan. The Government has alleged that more than 500 grams of methamphetamine mixture and substance was involved in the conspiracy.

## OFFENSE CONDUCT

The defendant admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for his plea of guilty. The statement of facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

1

**Facts**

On April 2, 2010, Mobile County Sheriff's Deputy Dawn Alfonsi was notified that two black males purchased pseudoephedrine at the Wal-Mart at Schillinger's Road and Airport Boulevard. An undercover operative inside the store provided the information to the officers. Both subjects were run in a data base to determine whether they had purchased more pseudoephedrine than was allowed. When this data base check was positive, Deputy J.T. Sullivan observed when one of the subjects, Jarrid Fielder, got into a white Chevrolet Trailblazer. He drove to the front of the store and picked up Woodrow Bigham, the second subject. Deputy J. T. Sullivan began to follow them. A marked patrol vehicle was contacted by the investigators to stop the Trailblazer so that the deputies could pursue an investigation.

The deputies advised Fielder and Bigham of their Miranda rights. They stated that they understood their rights and agreed to make statements. Deputy Sullivan spoke first to Bigham, and he stated that he bought the pills because he had a cold. Deputy Sullivan then spoke to Fielder. He asked Fielder if he had anything on him, and Fielder pulled out some money and a receipt from Target. He asked Fielder what he had purchased from Target and he admitted buying a box of pseudoephedrine. Deputy Sullivan asked what he had purchased at Wal-Mart, and he said he bought a box of pseudoephedrine. He asked Fielder what he was doing with the pills, and Fielder stated he was giving them to Bigham. Fielder stated that Bigham was selling them to someone and he was just trying to make money to get a tux for the prom that night.

Deputy Sullivan went back to Bigham and asked him what he was doing with the pills. He dropped his head and admitted that he was selling them for $40 per box to a white male named "Mike." Fielder stated that hey had nine boxes in the vehicle. Bigham and Fielder stated

2

they would work with the officers and Bigham agreed to call "Mike" to tell him that they had the pills and were ready to meet. "Mike" told Bigham to meet him at the Pride Station on the I-65 service road in about 45 minutes.

The deputies instructed Bigham to have Mike get into the vehicle with them and show Bigham the money. Bigham was then to get out to retrieve the pills from the rear of the vehicle. Bigham was then instructed to give the pills to Mike, and when mike had the pills, Bigham was told to hang his right arm out the window. Bigham stated that he understood the plan, and the officers followed Bigham and Fielder to the Pride station. Deputies Sullivan, Busby and O'Shea set up in the parking lot to engage in surveillance. At about 3:13 p.m., a black Hummer entered the parking lot.

Deputy Busby recognized the Hummer as belonging to Tony Foley from Robertsdale, as the result of her participation in an investigation earlier in the year, detailed below. Deputy Busby notified the other participating units of her suspicion that the black Hummer was Foley's vehicle. The Hummer drove past the Trailblazer then turned around and pulled in behind it. A white male subject later identified as Michael Wayne Hearin approached the passenger of the Trailblazer and conducted the transaction to purchase the pseudoephedrine. Bigham hung his arm from the window, and the officers closed in to make the arrests. Deputy Busby drew her weapon and approached the driver. Deputy O'Shea approached the front passenger's side and Agent Wright approached from the front of the vehicle. The other law enforcement vehicles activated their lights and sirens. Deputy Busby repeatedly ordered the driver to turn the vehicle off and exit. The driver, subsequently identified as Michael Lowe Palmer, put the vehicle in reverse and began to back up. All the officers ordered Palmer to stop and exit. He drove it back

3

and forth a couple of times, then sped away from the officers, almost running over Deputy

O'Shea. Deputy O'Shea fired one round into the driver's side front tire. In spite of the flat front

tire, Palmer then entered the I-65 service road at a high rate of speed. Deputy Busby and Deputy

O'Shea got into their unmarked police vehicle and gave chase.

Meanwhile, Deputy David McLeod chased Hearin, who attempted to flee the scene on

foot. Hearin tripped and fell, and Deputy McLeod ordered him to stay on the ground. He refused

and was eventually tased. Deputy Sullivan recovered the nine boxes of pseudoephedrine and

$240 in cash that Hearin had paid Bigham. The boxes were 20 tablets per box, 120 milligram

pseudoephedrine, for a total of 21,6000 milligrams of pseudoephedrine.

Palmer drove the Hummer into the parking lot behind the Mayflower Trucking business,

and off the pavement down the utility easement until it got stuck in heavy mud. Deputy Busby

saw Palmer bail out of the vehicle, and he fled on foot into the nearby woods. As she and Deputy

O'Shea approached the passenger's side of the Hummer, a white female later identified as Tracie

Lenora Everett opened the rear passenger door. Deputy Busby recognized Foley as he opened the

front passenger door. Neither of them got out of the vehicle, in spite of the officers' commands

that they exit and get on the ground. Deputy Alfonsi approached Everett and pulled her out of

the vehicle onto the muddy ground. Everett continued to resist the officers and refused to

comply with instructions. She was handcuffed and moved to a patrol unit. Deputy Alfonsi

turned her attention to Foley, as he was sitting in the front passenger seat leaning down toward

the step rail below the front passenger door where he was sitting as he continued to lower his

hands and arms out of sight between the two open doors. Foley appeared to be manipulating

something behind the doors. He refused to put his hands up or exit the vehicle. Deputy Alfonsi

4

also pulled Foley from the vehicle.  As she did that, a glass pipe with a length of plastic hose attached fell onto the mud.  He continued to struggle with Deputy Alfonsi, attempting to pull away.  She forced him to the ground and struck Foley in the right side of the head using her closed right fist.  He stopped resisting and was handcuffed.

Deputy James Houseknecht and his police dog were called to the scene to track Palmer. The dog is also trained to alert to the odor of controlled substances.  The officers tracked Palmer about a half-Mile in the muddy woods.  Palmer had hidden underneath a fallen tree and covered himself with limbs.  He resulted to heed the officers' commands to come out, and the dog bit Palmer on both sides and on the back of the leg.  Palmer was taken into custody after a brief struggle.

The deputies noticed that there was a pack of Marlboro Light cigarettes in the floorboard where he had been sitting.  A light blue zippered pouch had fallen onto the mud as well. It also contained a length of plastic hose and a plastic bag.  The items were tossed back into the floorboard and seat of the vehicle out of concern that they would be lost in the mud.  Tracie Everett was escorted out of the muddy area to a marked unit.  The deputies searched her purse and discovered a glass pipe containing burned residue, which appeared consistent with methamphetamine.  The pipe was wrapped in a white paper towel.  The deputies found a Community Corrections random drug testing card and card keys to two separate hotels.  Everett claimed that the pipe belonged to Tony Foley.  Deputy Busby advised Foley of his rights and he stated that he understood his rights.  He agreed to answer questions, and admitted that the pipe in Everett's purse was his.

At 5:15 p.m., a wrecker was able to tow the Hummer out of the mud where it had been

stuck. The deputies inventoried the vehicle and found several items of evidentiary value. A Marlboro Light cigarette pack containing cigarettes and three small ziplock baggies containing .52 grams, .47 grams, and .55 grams of suspected methamphetamine. This was the cigarette pack that was on the front passenger floorboard where Foley had been sitting. There was also a glass pipe and a light blue zippered pouch containing a plastic hose and a plastic baggie, both of which had fallen out of the vehicle when Foley opened the door. The deputies took some samples of a white granular substance that was all over the interior of the vehicle. A camera was also found in the vehicle.

The deputies found a receipt of Michael Lowe Palmer from the state of Alabama for drug testing, dated March 29, 2010, which was located on the floorboard behind the driver's seat. Other personal items of Foley's were found in the vehicle, including an MGM Mirage Players Card in his name, which was inside a nylon bag containing various items used in the manufacture of methamphetamine (lye, drain opener, a sifter, plastic tubing, a funnel rubber glovers, one pseudoephedrine tablet, a laminated map for Florida, used and unused coffee filters, a thermometer, and a lithium battery). Two hotel receipts issued in the name of Tracie Everett were also recovered.

After this incident, the officers began to compile all the information relating to previous methamphetamine investigations in which these subjects were implicated. Deputy Alfonsi recalled that the same Hummer had been implicated in a investigation targeting several subjects associated with a location in Spanish Fort. Deputy Alfonsi had traveled to a particular location in Spanish Fort, attempting to execute arrest warrants on Timothy Seabury, who was also implicated in the manufacture of methamphetamine. The first trip to the Spanish Fort location

6

was December of 2009.  At that address, there were two trailers on the same parcel of property.

Deputy Alfonsi and the other officers stopped at the first trailer, where Delia Leigh Cook and

Michael Lowe Palmer were found.  The officers told Cook that they were looking for Seabury,

and she directed them to the second trailer, which was further away from the main road.  When

they arrived at that trailer, they found the back door open, and a trail through the wet grass where

someone had fled from the trailer.  The officers secured the people remaining inside the trailer,

Daniel Newburn, Chelsie French and another female.  They followed the trail through the dew to

the wood line behind the trailer, and found a plastic case container methamphetamine and

associated paraphernalia.

On February 5, 2010, ABC Agent Kevin Wright, Deputy Alfonsi and Deputy Busby

traveled to the same location, 9041 A Old Mobile Road, in Spanish Fort, in an effort to serve an

arrest warrant on Daniel Newburn, another subject implicated in the manufacture of

methamphetamine.  The deputies knocked on the door of the trailer on the front of the property,

and Delia Cook eventually opened the door. She again claimed to be the primary resident.  She

told the officers that Newburn was there in the trailer with her, and that he was passed out in the

back bedroom.  The deputies informed her that they had a felony warrant for Newburn and they

needed to enter to arrest him.  She nodded, and admitted them.  They entered the residence and

found Newburn and Chelsie French in the back bedroom.  Newburn was on the bed and French

was on the floor.  The officers took Newburn into custody and secured French.  They noticed in

plain view on top of a desk a mirror which contained lines of white powder believed to be

methamphetamine next to a glass smoking pipe with a rubber tube attached to it. Newburn had

attempted to hide an ibuprofen bottle under the sheets of the bed while he was being arrested, and

7

the officers took it into custody as well. Cook was advised of her rights, and she agreed to talk to the officers. She admitted that she probably had marijuana in the room she shared with her boyfriend, Michael Palmer. In addition, a drug detecting dog gave a positive indication for the odor of drugs on three vehicles in the yard at the residence, one of which was the black Hummer. The officers obtained a state search warrant for the premises and the vehicles. Baldwin County Sheriff's Deputy Jason Selph responded to the residence to assist in the execution of the warrant.

The officers recovered the mirror with methamphetamine on it, the bottle which contained approximately a gram of methamphetamine, $675 in U.S. currency (found in Newburn's pants pocket), two yellow baggies containing white residue, several blue baggies found in the master bedroom, two partially smoked marijuana cigarettes, several baggies containing suspected methamphetamine in Cook's purse, two glass pipes with burned residue in a zebra striped purse on the master bedroom floor, a Winchester model 9422.22 caliber rifle, serial number F24456, in the passenger's seat of the black Hummer, assorted papers for Daniel Newburn and Tony Foley in the black Hummer, three two-tablet packs of pseudoephedrine in the center console of the Mitsubishi Montero, and mail for Delia Cook at the residence address, recovered from the kitchen.

The subjects were advised of their rights and Newburn admitted that he used methamphetamine a few hours before the officers arrived at the house. He admitted that the methamphetamine in the rear bedroom was his. He also admitted that the .22 caliber rifle found in the black Hummer was his. Newburn also admitted that he manufactured methamphetamine, but claimed he had not cooked any in the last few days. Cook admitted that she used marijuana, but denied using methamphetamine recently, even though the officers found methamphetamine

in her purse.  French denied using any illegal drugs recently.

Tony Rodger Foley was at the trailer in the back of the property, with other individuals including Tracie Everett. Foley told the deputies that the Hummer was his, and he needed to use it to go to a doctor's appointment for his injured foot.  The deputies did not release the Hummer to Foley at that time, but ultimately decided not to have it towed on that occasion.

In addition, the investigators found that Palmer and Foley had been arrested as a result of an incident investigated by the Mobile Police Department involving their participation in methamphetamine manufacture on the Causeway.   MPD Officers Sylvia Bedgood and Brooke Walters responded to a call on October 5, 2010, to a possible meth lab and a male down at 2701 Battleship Parkway, room 232.  The officers arrived at the scene and spoke to the maintenance person, who stated that several individuals approached the front desk and asked for a room key because they could not unlock their door.  The clerk refused to provide it and the subjects left the property.  The maintenance man went to the room and opened the door.  He found Michael Palmer asleep in the bed. Although the maintenance man attempted to wake Palmer up, he was unresponsive.  Hotel employees contacted the paramedics, and they responded to the room.  They were able to wake Palmer up, and checked him, but he walked away from the room during that time.

The fire department directed the police officers to the room, and they found the door open.  In plain view they saw a glass plate and a propane torch on the night stand from outside the door.  The officers were informed that the occupant of the room was attempting to leave the scene, and Officer Bedgood found him crouching under the building attempting to hide.  Palmer was handcuffed and secured.  Officer Walters returned to the room and spoke to the paramedics.

9

They told Officer Walters that they were cancelling their request for a Haz Mat team because they did not find any dangerous chemicals.

The officers asked the fire medics whether they needed to check Palmer further, and were told no, that they had already checked him and he was fine. Officer Walters examined a large glass pipe with residue on the night stand next to the bed. The officers also found a glass plate containing white powder residue next to the pipe. On the bed was a black bag which contained two cans of butane and numerous small bags used to package drugs. Officer Walters pulled the items out and found seven small bags containing white powder, a few unknown pills, a small glass pipe with residue and two small scales. Officer Jeff Stone, assigned to the narcotics unit, responded to the scene as well.

Officer Stone advised Palmer of his rights. Detective Stone observed Palmer and formed an opinion that he was not under the influence of anything that impaired him. He asked Palmer about that, and Palmer said he was not under the influence of anything. Palmer agreed to waive his rights and make a statement. He told Officer Stone that he had been pressured by his friend Tony Foley, aka Buster, to rent the room, and he used an alias, Johnny Palmer, for that purpose. Palmer told the officers that Foley and an unknown female were in the room, and that Foley had methamphetamine with him. Palmer told the officers that Foley had possibly cooked meth in the room. Palmer also admitted that he was aware that Foley sold large quantities of meth and that there were meth pipes in the room. Palmer stated that he believed Foley took the drugs and left the premises after Palmer passed out. When questioned about where Foley and the female were, Palmer told the officers that they were out "pill shopping." Palmer was found in possession of an Alabama drivers license in the name of Vinson Brady Cowser, II. Palmer told the officers that

10

Foley used the drivers license to buy pills.

Detective Stone obtained Palmer's consent to search the room. He conducted the search and seized additional evidence, including the glass meth pipe on the night stand, a piece of plastic tubing on the bed, a plastic hide-a-box on the bed, two cell phones with charges on the bed, two digital scales on the bed, a ziploc bag containing empty small ziploc bags and unused coffee filters, 17 small ziploc bags, each containing meth found on the bed, and one small zip lock bag containing meth found on the bed. Detective Stone also located and seized a laptop computer found on the night stand that Palmer said belonged to Foley, which he had traded for five grams of meth two weeks earlier. Detective Stone photographed all the items and seized them as evidence. Detective Stone also obtained a copy of the room lease from the hotel manager as evidence in the case. Heather B. Wilson was also listed on the room, and provided the same address that appeared under Palmer's alias of Johnny Palmer, 217 Malaga Drive, in Satsuma. She also provided a credit card number and a phone number.

### Co-defendant's Proffer

Michael Lowe Palmer provided a proffer in January of 2012 after his arrest on federal charges. Palmer told the deputies that he had met Foley a short time before Seabury was arrested in February of 2010, having been introduced to Foley by Danny Newburn. According to Palmer, Newburn was supplying Foley with methamphetamine and Foley was allowing Newburn to use his black Hummer. Palmer was present when Newburn gave Foley 10 ounces of methamphetamine a couple of months prior to Newburn's arrest in February of 2010. Palmer told the officers that Foley had several clients who purchased meth provided to Foley by Newburn. Foley would bring money back to Newburn. Newburn would provide Foley with

11

personal use methamphetamine in connection with the distribution scheme. Palmer identified a subject in Mobile (S-1) to whom Foley supplied methamphetamine ice on three separate occasions. Palmer told the officers that the first time was five grams of methamphetamine ice. When S-1 paid Foley for the ice, Foley provided another 8 grams. Palmer stated that the third occasion was for 10 grams of ice, but Foley gave it to Chelsie French to deliver to S-1.

Palmer identified Foley's connection for methamphetamine ice as a person in Florida. Palmer told the deputies that the laminated map they seized from the Hummer showed the route Foley used to meet a subject in Florida (S-2), who was supplying Foley with methamphetamine ice. Palmer stated that the first time Foley went to Florida to meet S-2, Foley took two jet skis which served as collateral for the first deal, which was for two ounces of methamphetamine ice. Palmer went with Foley on the second trip to meet S-2. Foley had $1,500 in cash and a pound of marijuana to trade for three ounces of methamphetamine ice. Palmer told the deputies that S-2 was upset with Foley because the deal was for a pound and half of marijuana, and Foley was trying to pass of one pound as a pound and half. Palmer said that eventually Foley and S-2 reached an agreement, and Foley left with the three ounces of methamphetamine ice. Foley asked Palmer's girlfriend, Cook, to wire $1,000 to S-2. She did it.

Palmer stated that Foley fronted S-3 five or six grams of the three ounces of methamphetamine ice Foley got in Florida the last time at a residence on Lott Road in Mobile. S-3 bought boxes of pseudoephedrine from another subject, S-4, which Foley used to manufacture methamphetamine. According to Palmer, S-3 would cook the pseudoephedrine into methamphetamine for Foley, and he and Foley would split the finished product 50-50. On one occasion, Palmer personally picked up S-3 after S-3 cooked 10 boxes of pseudoephedrine into a

12

24-gram rock of methamphetamine. Palmer saw the drugs when S-3 got into his vehicle. S-3 put the rock of methamphetamine on a digital scale, and Palmer saw that it weighed up at 24 grams. Palmer took S-3 to Foley's residence to split the methamphetamine with Foley, but they could not get Foley to wake up. Palmer himself later delivered Foley his share, 12 grams of methamphetamine, from this incident.

Palmer told the deputies that he knew Michael Hearin from growing up with him in Saraland. Palmer explained that Hearin met Woodrow Bigham in April of 2010, and that he had gotten about 10 boxes of pseudoephedrine from him. Hearin and his brother Matt went to Chickasabogue Park where they boarded a boat and traveled to a location up the river to cook methamphetamine. Hearin and his brother called Everett, who was with Foley and Palmer, and wanted to know if she knew of anyone who wanted to buy pseudoephedrine. Of course, Foley and Palmer were interested, and they all three went to the Red Roof Inn on Dauphin Street to pick up Hearin. They left Hearin's brother at the hotel. The four of them, Palmer, Everett, Foley and Hearin, then drove to the meeting location to get the pseudoephedrine from Bigham and his companion. Palmer stated that he saw Hearin with 15 or 16 grams of finished methamphetamine that Hearin and his brother cooked on the river on April 2, 2010. Hearin left the drugs with his brother in hotel when Hearin left with Palmer and others to meet Bigham.

### Pharmacy Records

Pharmacy records reflect that Tracie Everette purchased pseudoephedrine regularly in her own named beginning in October of 2009. Records also reflect tha Bigham and Foley began regular purchases that same month, October, of 2009. Palmer began to make regular purchases in November of 2009. Jarrid Fielder began to make purchases in January of 2010 through April

13

2, 2010, when he and Bigham were confronted by the deputies. Bigham bought on April 3, 2010, July 24, 2010, twice on November 19, twice on December 16, 200, twice on December 28, 2010, twice on January 7, 2010, on April 28, 2011, May 29, 2011, June 16, 2011, and twice on June 17, 2011. Foley began to make buys again on May 25, 2010, and continued to make such purchases through September of 2011. Palmer began to make buys again on July 1, 2011, through December 28, 2010, when he was apparently arrested again. The amount of pseudoephedrine purchased by all the conspirators totals approximately 870.46 grams.

The parties agree that the defendant is accountable for from 500 grams to 1.5 kilograms of methamphetamine mixture and substance as relevant conduct. Hearin asserts that his brother did not make the trip up the river to manufacture methamphetamine on April 2, 2010.

AGREED TO AND SIGNED.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: ___1/23/12___

Gloria A. Bedwell
Assistant United States Attorney

Date: ___1-23/12___

Michael Wayne Hearin
Defendant

Date: ___1-23-12___

Raymond L. Bell, Jr., Esq.
Attorney for Defendant

14